**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**(Alexandria Division)**

| | |
|---|---|
| _____ )<br><br>CYNTHIA CONROY )<br>2110 Wilkes Court, #105 )<br>Herndon, Virginia 20170 )<br> )<br> and )<br> )<br>EILEEN C. LAU )<br>1573 Kingstream Circle )<br>Herndon, Virginia  20170 )<br> )<br> Plaintiffs, )<br> )<br> v. )<br> )<br>CATHOLIC DIOCESE OF ARLINGTON )<br>200 North Glebe Road, Suite 914 )<br>Arlington, Virginia 22203 )<br> )<br>SERVE:  Mark E. Herrmann, Esq. )<br>  Chancellor and General Counsel )<br>  Arlington Diocese )<br>  200 North Glebe Road, Suite 914 )<br>  Arlington, Virginia 22203 )<br> )<br> Defendant. )<br>_____ ) | C.A. No. _____ |

## COMPLAINT

COME NOW THE PLAINTIFFS, CYNTHIA CONROY and EILEEN C. LAU, by

counsel, and move this Court for entry of judgment in their favor, jointly and severally, and

against the Defendant, CATHOLIC DIOCESE OF ARLINGTON, and in support of such motion

allege and aver as follows:

## NATURE OF ACTION

1.      This action states claims against Defendant for gender discrimination, as well as retaliation, pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.,* and specifically the creation and maintenance of a sexually discriminatory and retaliatory working environment in plaintiffs' employment.

2.      This action also states a common law claim of negligent retention of an employee.

## PARTIES

3.      Plaintiff Cynthia (Cindi) Conroy ("Ms. Conroy") is a resident and citizen of Fairfax County in the Commonwealth of Virginia.

4.      Plaintiff Eileen C. Lau ("Ms. Lau") is a resident and citizen of Fairfax County in the Commonwealth of Virginia.

5.      Defendant Catholic Diocese of Arlington ("Arlington Diocese") is one of the fifty largest dioceses in the United States.  Published 2017 statistics for the Arlington Diocese boasts 463,897 registered Catholics in the Arlington Diocese, with student enrollment at Catholic schools operated by the Arlington Diocese exceeding 16,700 students.[1]

6.      Both Ms. Conroy and Ms. Lau were employed by the Arlington Diocese as school administrators at St. Joseph School ("SJS"), a private, Catholic elementary and middle school (grades K-8) in Herndon, Virginia, in this judicial district.

7.      At all times relevant to this action, the Arlington Diocese was engaged in an industry affecting commerce, and had fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year.

---

[1] https://www.arlingtondiocese.org/about-us/the-diocese/statistics/

8.      The Arlington Diocese was, and is, an "employer" within the meaning of 42 U.S.C. § 2000e(b).

9.      The Arlington Diocese has had five hundred or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, within the meaning of 42 U.S.C. § 1981a(b)(3)(D).

## JURISDICTION AND VENUE

10.     The amount in controversy in this action exceeds the jurisdictional minimum amount for this Court.

11.     The causes of action alleged in this action arose in this judicial district, in Fairfax County, in the Commonwealth of Virginia.

12.     This Court has jurisdiction over Plaintiffs' claims under the common law of Virginia.

13.     This Court has jurisdiction over the subject matter of Plaintiffs' claims under Title VII of the Civil Rights Act of 1964, as amended, pursuant to 42 U.S.C. § 2000e-5(f).

14.     The Arlington Diocese is present in and regularly conducts business in Fairfax County in the Commonwealth of Virginia, in this judicial district.

15.     The tortious acts and causes of action alleged to have been engaged in, as well as the resultant injury, were committed in Fairfax County, in the Commonwealth of Virginia, in this judicial district.

16.     The illegal and tortious acts committed by the Defendants occurred in this judicial district and records relevant to such illegal and tortious acts are maintained in this judicial district.

17.     The Arlington Diocese is subject to personal jurisdiction of this Court pursuant to Va. Code § 8.01-328.1 (A)(1), (2) and (3).

18.     Venue over Plaintiffs' common law claims is proper under Va. Code § 8.01-262 (1), (2), (3) and (4), and is proper in this Court.

19.     Jurisdiction and venue are proper in this Court.

## PROCEDURAL STATUS

20.     Ms. Conroy timely filed a Charge of Discrimination with the United States Equal Opportunity Commission ("EEOC") on August 15, 2018.

21.     Ms. Lau timely filed a Charge of Discrimination with the United States Equal Opportunity Commission ("EEOC") on August 15, 2018.

22.     Ms. Conroy received a right-to-sue letter dated August 20, 2018.

23.     Ms. Lau received a right-to-sue letter dated August 20, 2018.

24.     All prerequisites to filing suit have been met, and this action is timely filed.

## BACKGROUND

25.     Ms. Conroy began her employment with the Catholic Diocese of Arlington in August, 1990.  Ms. Conroy held teaching positions at St. Thomas More Cathedral School and Linton Hall School prior to assuming the Assistant Principal position at St. Joseph School ("SJS"), a private, Catholic elementary and middle school (grades K-8) in Herndon, Virginia.  In July 2014, Ms. Conroy became the Principal of SJS.

26.     Ms. Lau began her employment with the Catholic Diocese of Arlington in August 2006.  In July, 2016, Ms. Lau became the Assistant Principal at SJS, reporting directly to Ms. Conroy.

27.     SJS is operated by the Catholic Diocese of Arlington.  The pastor of St. Joseph Catholic Church is Father Tom Bourque ("Father Tom").  Reference herein to "SJS" inherently includes the Catholic Diocese of Arlington.

28.     SJS receives federal funding under Title I and Title II-A of the Elementary and Secondary Education Act, as amended.  SJS is accredited by the Virginia Council of Private Schools. The Diocesan of Arlington Policies and Procedures regarding personnel does not state being Catholic is a prerequisite to employment at SJS.  Moreover, the policies and procedures on harassment, retaliation and EthicsPoint relevant to this Complaint are not afforded protection under ministerial exception.

29.     As Pastor St. Joseph Catholic Church, Father Tom has final supervisory and managerial authority over the teachers, staff and administrators of SJS.

30.     Father Tom was inexplicably opposed to hiring Ms. Lau for the Assistant Principal position from the start, even though she was eminently qualified for the position, with stellar recommendations, and despite the fact that she was unanimously chosen for the position by an interview panel.  Ms. Lau could only assume it was because of her gender.

31.     Upon Ms. Lau's hire, Father Tom changed the Assistant Principal title (the specific position for which Ms. Lau had been hired) to a Director position, and Ms. Lau became the Director of Curriculum and Instruction.  In addition, Father Tom mandated that Ms. Lau complete a second graduate program (despite being fully qualified for the job when she was hired, already with a graduate degree), while she was working her full-time job, which increased Ms. Lau's financial burden.

32.     During Ms. Conroy's tenure as Principal at SJS, and Ms. Lau's tenure as Director/Assistant Principal at SJS, it was apparent that Father Tom treated the male employees differently than the female employees.

33.     For instance, one male employee was given additional "perks," such as a "company" car, and was granted access to technology that the female employees were not (which prevented female administrators from effectively doing their jobs).

34.     Specifically, during Ms. Conroy's employment, Danny Rucker ("Mr. Rucker"), the Facility Superintendent, drove a truck to and from work that was purchased by the parish, and his gas was paid for by the parish. His cell phone was also purchased by the parish, and his salary is higher than females of a comparable level.  Mr. Rucker is also granted the freedom to work a second job, and the freedom to leave work early to play golf and take multiple vacations during the school year.

35.     Mr. Rucker controls all of the administrative rights over the school's cameras and technology, dictates set-up of classroom technology (instead of allowing the teachers to do so) and has refused to give female employees (including the Director of Technology and the Computer Science teacher) administrative rights.  His actions are fully supported by Father Tom, and are impediments to the effected female employees from being able to fully perform their jobs.

36.     In addition, Ms. Conroy was unable to access the security cameras since September 2017 despite her multiple requests that this be fixed.  Mr. Rucker took no action to resolve the issue, even after two situations where students went missing (later found safe) in the school and the administrative team was not able to use the cameras to locate the student.

37.     Father Tom was known to use profanity to describe women to the male employee (including, but not limited to referring to female employees as "bitches").

38.     It is common knowledge that Father Tom has a violent temper that he cannot control.  As a result, he is verbally abusive and vocal about his disdain for women, regularly displaying bullying and intimidating behavior towards female employees.  Father Tom berates females by email and in person during meetings.

39.     On or around August 31, 2017, during a time when the administration and the Parent-Teacher Organization ("PTO") were engaged in planning a fundraiser for the school, Father Tom called the PTO Vice President a "bitch" and used profanity when describing Ms. Conroy, the PTO Board and PTO members to Mr. Rucker.  Father Tom lost his temper at the August 30 PTO meeting when the PTO Board discussed having the annual fund raiser off campus, becoming belligerent and verbally attacking the PTO Board, and threatening that he and the others priests would not attend.

40.     SJS operates after school clubs.  Father Tom granted the only male club moderator $5000 for his after school program.  No other after school club received a stipend.

41.     In or around the fall, 2017, Ms. Lau reported Father Tom's harassment and discrimination to Ms. Conroy, her direct supervisor.

42.     In November 2017, Ms. Conroy informed Ms. Lau that that she had reported Father Tom's harassment and abusive conduct to Jennifer Bigelow, Ed.D. ("Superintendent Bigelow" or ("Dr. Bigelow") (the Superintendent of Catholic Schools) as well as to Sister Karl Ann Homberg ("Sister Karl Ann") (Assistant Superintendant for Catholic Leadership – Office of Catholic Schools), in December 2017.

43.     In December 2017, and again on or around February 1, 2018, Ms. Lau reported Father Tom's abusive, harassing and discriminatory conduct to EthicsPoint (a third party confidential reporting tool through which employees can report issues related to harassment, discrimination or other misconduct in the workplace).  The Bishop encouraged employees to use EthicsPoint as a safe way to report harassment.  Ms. Conroy became aware of these reports made by Ms. Lau shortly after Ms. Lau made the reports

44.     Although employees are also encouraged to report concerns or complaints to their supervisors, there is no formal chain in place as to how such reports should be made.

45.     After that, Father Tom's illegal, abusive, discriminatory and harassing behavior escalated, in retaliation for Ms. Lau's complaints, and Ms. Conroy's escalation of Ms. Lau's complaints.

46.     On February 6, 2018, Father Tom notified Ms. Conroy that she could return as Principal for the 2018-2019 school year, only if she fired Ms. Lau and Ms. Beltran.  Ms. Conroy was shocked by this pronouncement, and was given a deadline of February 13 to make her decision.

47.     That evening, Ms. Conroy called Superintendent Bigelow, who called Human Resources, asking for help and guidance, and whether Father Tom's ultimatum was legal, since neither Ms. Beltran nor Ms. Lau had any performance issues and there was no justification for terminating either administrator.

48.     Dr. Bigelow advised Ms. Conroy that Human Resources would contact her, and instructed Ms. Conroy not to meet with Father Tom until she spoke with HR.  Dr. Bigelow also assured Ms. Conroy that she would keep this in confidence, and not speak to Father Tom about what they had discussed.

49.     Neither HR nor Dr. Bigelow ever reached back out to Ms. Conroy, despite her multiple attempts to contact them, including on February 7th and the morning of February 8th.

50.     On February 8, 2018, Dr. Bigelow, Teresa M. D'Elia ("Ms. D'Elia") (Director of Human Resources) and Dana Brooks (Manager of Human Resources), spoke with Father Tom.

51.     On February 8, 2018 at 12:00 noon, Ms. Conroy received an email from Ms. D'Elia, stating that she had not returned her calls because she agreed with what Dr. Bigelow had told Ms. Conroy, so saw no need.  She also stated:

> Jennifer [Bigelow], Dana [Brooks], and I have spoken to Fr. Tom to understand from his viewpoint what was discussed with you regarding the contract for you, Eileen and Sarah for next year.  I understand that Fr. Tom will be meeting with you again today or tomorrow for further discussion.  I think that it's best for that meeting to occur before scheduling a time for you to meet with HR.  In addition, neither Dana or [sic] I is available today or tomorrow, as we are both involved in multiple previously scheduled meetings each day . . .

52.     Immediately thereafter, Father Tom stormed into Ms. Conroy's office while she was on the phone (with a "do not disturb" sign), interrupting her.  The "further discussion" was nothing more than Father Tom screaming at Ms. Conroy, and falsely accusing her of insubordination (for reporting his illegal conduct).  He was visibly angry and red faced while yelling.  Father Tom is physically intimidating.  Father Tom yelled that Ms. Conroy was fired, despite the fact that she had been offered a verbal contract renewal just two days prior.

53.     Ms. D'Elia obviously knew Father Tom's plans, and made herself and Dana Brooks (Manager of Human Resources for the Catholic Diocese), conveniently "unavailable" to speak to Ms. Conroy for two days.

54.     That same day, Father Tom yelled at staff in such an abusive manner that Mary Lewis became distraught, crying.  Ms. Lewis begged Ms. Lau not to leave, and kept repeating, "Please don't leave.  Please help Cindi [Conroy]."

55.     Father Tom then called for Ms. Lau and Ms. Beltran over the loud speaker, and when they arrived, he fired them also.  Ms. Lau was told she could finish out the school year, but would not be offered a contract for the 2018-19 school year.

56.     Father Tom called a mandatory meeting of all faculty and staff to be held immediately after school, in the library, without giving Ms. Conroy, Ms. Lau or Ms. Beltran prior notice.

57.     The day that Ms. Conroy, Ms. Lau and Ms. Beltran were fired, they were forced to remain in the building until 9 pm because of the annual school Science Fair.  There were over 200 parent volunteers present.  Ms. Lau and Ms. Beltran were forced to remain silent about the traumatic experience that had occurred earlier in the day.

58.     The entire administrative team – Ms. Lau, Ms. Beltran and Ms. Conroy – were fired in retaliation for Ms. Conroy's and Ms. Lau's reporting Father Tom's abusive, discriminatory and harassing behavior to Superintendent Bigelow, Assistant Superintendant Sister Karl Ann, and for Ms. Lau's reporting to EthicsPoint, and for doing what employees were encouraged to do – report such behavior to their supervisors..

59.     On the day that the administration team was fired, Father Tom threatened the parish staff (through Jeanne Nappier and Danny Rucker) that if they talked to the school staff or about Father Tom, they would be fired immediately.  This threatening behavior prevented a thorough and unbiased investigation from being conducted.

60.     The sham "investigation" concluded in a letter from Father Ferguson, determining that there was no wrongdoing on the part of Father Tom or anyone else.

61.     The Catholic Diocese of Arlington (via the Office of Catholic Schools), through, at a minimum, Superintendent Bigelow and Assistant Superintendent Sister Karl Ann, was aware

of the ongoing abuse, discrimination and harassment, but did nothing to remedy or stop the conduct.  Although Dr. Bigelow was supposed to visit SJS during December 2017 to address the situation, that never occurred.

62.     Ms. Lau spoke to Ds. Bigelow on Friday, February 9, 2018 and asked her if she had endorsed the administrative team being fired without just cause. She replied that "the pastor can do whatever he wants."

63.     The discrimination, harassment and abusive conduct was ratified and condoned by the Catholic Diocese of Arlington lack of action to protect the administration, staff and students at SJS, and conducting a sham investigation that found no wrong doing despite overwhelming evidence to the contrary and letters and petitions from parents.

64.     Although it was requested that a neutral third party conduct an investigation, instead, Human Resources conducted interviews.  This was a biased investigation since Human Resources was directly involved with the termination of the administrative team.

65.     In addition, Father Tom posted the news of the terminations on the home page of the parish website, where it remained for approximately seven months.  However, when the male youth minister departed, his job opening was not posted on the church website.

66.     On February 12, 2018, Father Tom sent an email to the SJS community advising of his decision to ". . . move SJS forward with a different Catholic leadership model for the 2018-2019 school year."  The "new model" removed the existing principal (Ms. Conroy) and the two existing directors (Ms. Lau and Ms. Beltran), and proposed to replace them with a new principal and one assistant principal.

67.     Approximately 300 letters were sent to the Bishop of the Diocese and/or Superintendent Bigelow requesting reinstatement of the administrative team (Ms. Conroy, Ms.

Lau and Ms. Beltran), and for Father Tom's removal as pastor.  A petition was also sent to the Bishop with over 75 signatures, with the same demands.

68.     The grandfather of one student sent an email expressing his concern and outrage at the events that had transpired, and his concern that his grandson may not be in a nurturing environment "due to the destructive, aggressive and VERY un-Jesus like behavior of . . . Father Tom."  He said, "I smelled a rat when this story broke.  It made sense having been around Fr. Tom.  Now I understand that many concerned and dedicated to St Joes parents, are receiving a 'stone wall' response as they try to step up and speak out against Fr Tom and his actions and behaviours [sic]. . ."

69.     On February 16, 2018, Superintendent Bigelow, in response to the growing opposition from the SJS community, sent a letter with the stated intent "to clarify some items." In her letter, Dr. Bigelow affirmed that ". . . it is ultimately the pastor who is responsible for the administration of a school at a parish . . . . As such, the pastor may make changes to a school's administrative structure as he deems necessary."

70.     In response, on February 20, 2018, a group of approximately 75 SJS parents sent a letter/petition to Superintendent Bigelow, detailing their protest of, and many concerns with, the action taken by Father Tom, Father Tom's abusive conduct in the workplace, and Superintendent Bigelow's apparent ratification of his action and conduct.

71.     Among the listed concerns was the fact that Father Tom, the main offender and root of the problem, would be working closely with the Office of Catholic Schools to find a new principal for SJS.

72.     This petition also asked for:

- A detailed explanation of Father Tom's alleged vision for "moving SJS forward," including how a "different Catholic leadership model" will accomplish this goal;

- An explanation of how the Diocese investigates and ensures no retaliation;

- Clarification and documentation supporting the Diocese's position that a pastor, despite numerous complaints regarding his conduct in the workplace, can be responsible for the administration of a parish school;

- Explanation of the checks and balances system (if any) to ensure the pastor does not abuse his authority when making decisions that disrupt a school's day to day operations, and when making any changes to the school's structure "he deems necessary;"

- Who Father Tom must report to and gain approval from before making sweeping leadership changes at SJS (and if no one, characterizing it as a "dangerous abdication of responsibility by the Diocese");

- The identity of the "senior member" of the Office of Catholic Schools who will serve on Father Tom's search committee for a new administrative team, and how prospective parents will be identified for inclusion in the search committee.

73.     This petition went on to detail the harassing and abusive conduct by Father Tom towards staff and the SJS community at large, including, but not limited to:

- Unprofessional conduct, bullying and yelling at SJS staff and creating a hostile work environment;

- Angry outbursts at the SJS PTO and fundraisers;

- Noticeable lack of interest and participation in SJS functions and activities (all listed in detail);

- Arbitrarily prohibiting certain SJS-sponsored events from being held on school premises;

- Threatening, on numerous occasions, to alter or end SJS's involvement in Catholic Youth Organization programs, despite the Bishop's emphasis and support for these programs; and

- Failure to respond to parishioner concerns.

74.     The petition also pointed out concerns that Father Tom does not exhibit or maintain the qualifications necessary to effectively administer SJS (all the while, being permitted to oust the very effective and well-liked administrative team), and opined that Father Tom "has

13

failed our children on all accounts. Moreover, his hubris has created a virulent environment . . ." In addition, a surface search regarding Father's Tom's advanced religious studies and degrees uncovered a host of negative descriptors pertaining to Father Tom from St. Francis University.

75.     The petition concluded with a request for the "Removal of Fr. Tom (temporarily or permanently) as administrator of SJS, pending a full investigation, and findings, related to actual and alleged acts of hostility and retaliation. Fr. Tom should not be involved in any school decisions until there is a final, official, and transparent resolution to this matter."

76.     On March 28, 2018, during a "Listening Session" for the faculty facilitated by Sister Karl Ann Homberg (Assistant Superintendent), Father Tom threatened the entire faculty by stating that he supported "90%" of them, and implied that he planned to fire five or six faculty members despite excellent performance. He repeated this threat twice. Father Tom also informed the entire faculty in that meeting that Ms. Conroy, Ms. Lau and Ms. Beltran were not leaders and that the school did not need them. Father Tom's threatening behavior was called to the attention of Sister Karl Ann, who ratified and condoned Father Tom's behavior by taking no action whatsoever. Father Tom's threat was later reported to Ethics Point by a teacher present at the Listening Session. Nothing was done.

77.     On April 10, 2018, at a Listening Session for parents, alumni and parents of alumni, Father Tom began with a prayer, and then hid and listened from the kitchen with Danny Rucker despite being told not to remain for the session, and left before it was over.

78.     On April 13, 2018, Father Tom terminated the computer teacher, Christy Slifkey, while Ms. Conroy was out of the building. Ms. Conroy received an email informing her of the firing, after the fact, despite Father Tom and Superintendent Bigelow previously informing Ms.

Conroy that she would have input into whether faculty contracts were renewed.  Notably, Ms. Slifkey's husband is the PTO President.

79.     This occurred despite the fact that on three different occasions (one with the superintendent), Ms. Conroy was assured that all teachers would be given a contract for the 2018-2019 school year.  Ms. Lau was present in the building on April 13, 2018 as the acting principal and was not notified of Ms. Slifkey's termination.

80.     Father Tom's disingenuous, false and poorly fabricated attempted justification for Ms. Conroy's termination, and the terminations of Ms. Lau and Ms. Beltran - that he has "decided to move SJS forward with a different Catholic Leadership model for the 2018-2019 school year" -  is deceitful, insincere and self-serving at best.

81.     Ms. Lau and Ms. Conroy were excellent performers, and made an outstanding team.  Under their administration, SJS, as well as its teachers and community, was thriving, and the students had the best test scores in the Diocese.  As of January 2018, all teachers and staff intended to remain for the 2018-2019 school year.  After the administrative team was fired, 16 employees chose not to return to SJS for the following school year.

82.     Any employee who is found to be under performing at SJS is placed on a Performance Improvement Plan and required to meet with the pastor and principal regularly to focus on improving performance, or is given one on one counseling.  The only time Ms. Lau ever met with Father Tom during her tenure as Assistant Principal is when he fired her.  Neither Ms. Conroy nor Ms. Lau were ever placed on any Performance Improvement Plan, or directed to meet with the pastor or any superintendants (in Ms. Conroy's case), or the pastor and principal (in Ms. Lau's case), to focus on improving performance.

83.     As per Diocesan policy, an employee must be informed in writing by April 15, if the employee will not be offered a contract for the following school year.  Neither Ms. Conroy nor Ms. Lau was ever informed in writing that they would not be offered a contract for the 2018-2019 school year.

84.     Ms. Conroy sought counseling due to the impact of the stress on her physical and emotional health, and the manner in which the administrative team was fired.  Ms. Lau was treated by a dentist after she started grinding her teeth due to stress.

85.     During the fake "investigation," Human Resources accessed Ms. Lau's email and attempted to hold two emails over her head as a way to silence her about the harassment and discrimination.  Neither email went against any SJS policy or procedure.

86.     In addition, upon Ms. Lau's hire, Father Tom required her to complete a second graduate program (despite being fully qualified for the job when she was hired, already with a graduate degree).  At the time, Ms. Lau was given a partial leadership scholarship to help finance the program.  At the time of her termination, Ms. Lau was half way through the program, with 18 credits left to complete.  A condition of the scholarship is that Ms. Lau remains employed in the Diocese as an assistant principal for three years upon completion of the program, or else pay back the scholarship in full.  Father Tom's abusive, discriminatory and illegal termination of Ms. Lau's employment has prevented her from fulfilling the scholarship requirements, and will create a great financial hardship when she is forced to pay back the scholarship money.

87.     No adverse action was taken against Father Tom for his illegal, discriminatory, harassing and hostile behavior towards Ms. Conroy, Ms. Lau, and other female employees (including Ms. Beltran and Ms. Slifkey), as detailed above.

88.     Neither Ms. Conroy nor Ms. Lau was ever given any credible or accurate justification for how they were treated, or for their terminations.  The Catholic Diocese of Arlington has not offered any satisfactory or credible reasons, or attempt to justify, the acts of discrimination and harassment.

89.     The lack of communication from Father Tom to the community was intended to create the false impression that Ms. Conroy and Ms. Lau had done something wrong. There were rumors, misinformation, and gossip spread about the reason for their terminations.

90.     Ms. Lau was falsely accused of being a lesbian and having a sexual relationship with Ms. Conroy. She was also falsely accused of embezzling funds.

**COUNT ONE –**
**GENDER DISCRIMINATION AND**
**HOSTILE WORK ENVIRONMENT IN VIOLATION OF TITLE VII**
**(Cindi Conroy against Catholic Diocese of Arlington)**

91.     The allegations of each of the preceding paragraphs are incorporated herein as if specifically realleged.

92.     The Arlington Diocese discriminated against Ms. Conroy and subjected Ms. Conroy to a continuing hostile work environment on the basis of her gender, female.

93.     Father Tom engaged in discriminatory and hostile behavior towards Ms. Conroy from the onset of her employment, when it was immediately apparent that Father Tom treated the male employees differently than the female employees.

94.     Disparate treatment included awarding a male employee (Mr. Rucker) perks not afforded to female employees.  Such perks included use of a truck to drive to and from work that was purchased by the parish; gas paid for by the parish; a cell phone purchased by the parish; access to technology that the female employees were not given (which prevented female administrators from effectively doing their jobs); freedom to work a second job; freedom to leave

work early to play golf; freedom to take multiple vacations during the school year; and paying the male employee a higher salary than females of a comparable level.

95.     Mr. Rucker has refused to provide female employees (including the Director of Technology and the Computer Science teacher) administrative rights to the school's cameras and technology, and his actions are fully supported by Father Tom, and are impediments to the effected female employees from being able to fully perform their jobs.  Mr. Rucker also prevented Ms. Conroy from accessing the security cameras as of September 2017 despite her multiple requests that this be fixed.

96.     Father Tom granted the only male club moderator $5000 for his after school program.  No other after school club (with female moderators) received a stipend.

97.     Father Tom uses profanity to describe women to the male employee (including, but not limited to referring to female employees as "bitches"), and has exhibited verbally abusive and vocal about his disdain for women, regularly displaying bullying and intimidating behavior towards female employees, and berating female employees by email, and in person during meetings.  During a PTO meeting in August 2017, Father Tom lost his temper, called the PTO Vice President a "bitch" and used profanity when describing Ms. Conroy, the PTO Board and PTO members to Mr. Rucker.

98.     In or around the Fall, 2017, Ms. Lau reported Father Tom's harassment and discrimination to Ms. Conroy, her direct supervisor; in November 2017, Ms. Conroy reported Father Tom's harassment and discrimination to Superintendent Bigelow; in December 2017, Ms. Conroy reported Father Tom's harassment and discrimination to Assistant Superintendent Sister Karl Ann Homberg; and Ms. Lau made two reports about Father Tom's abusive, harassing and discriminatory conduct to EthicsPoint – in December 2017 and early February 2018.

99.     Despite the multiple reports, and the many witnesses to Father Tom's hostile and discriminatory conduct, no action was taken.

100.    In addition, Father Tom posted the news of Ms. Conroy's termination on the home page of the parish website, where it remained for approximately seven months.  However, when the male youth minister departed, his job opening was not posed on the church website.

101.    The Arlington Diocese's discriminatory treatment of Ms. Conroy violated Title VII of the Federal Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2(a)(1).

102.    In discriminating against Ms. Conroy in violation of federal law, the Arlington Diocese evidenced malice, spite, and ill will; its actions were willful and wanton; and evinced a conscious disregard for the rights of Ms. Conroy.

103.    As a direct and proximate result of the Arlington Diocese's actions, Ms. Conroy has suffered and continues to suffer anxiety, diminished self-confidence and self-worth, feelings of helplessness and hopelessness, insomnia, withdrawal from friends and family, fear and concern for her future ability to earn a living, crying, sadness, lack of concentration, humiliation, embarrassment, headaches, past and future loss of income and benefits of employment, lost career and business opportunities and advancement, medical expenses, other past pecuniary losses, future pecuniary losses, and other nonpecuniary losses.  Ms. Conroy sought counseling due to the impact of the stress on her physical and emotional health, and the manner in which the administrative team was fired.

104.    Due to the conscious disregard for Ms. Conroy's federally protected rights, and the severity of the Arlington Diocese's conduct, Ms. Conroy is also entitled to punitive damages.

**COUNT TWO –**
**GENDER DISCRIMINATION AND**
**HOSTILE WORK ENVIRONMENT IN VIOLATION OF TITLE VII**
**(Eileen C. Lau against Catholic Diocese of Arlington)**

105.    The allegations of each of the preceding paragraphs are incorporated herein as if specifically realleged.

106.    The Arlington Diocese discriminated against Ms. Lau and subjected Ms. Lau to a continuing hostile work environment on the basis of her gender, female.

107.    Father Tom engaged in discriminatory and hostile behavior towards Ms. Lau from the onset of her employment.

108.    Father Tom was inexplicably opposed to hiring Ms. Lau for the Assistant Principal position from the start, even though she was eminently qualified for the position, with stellar recommendations, and despite the fact that she was unanimously chosen for the position by an interview panel.  In addition, upon Ms. Lau's hire, Father Tom changed the Assistant Principal title (the specific position for which Ms. Lau had been hired) to a Director position. Then, he mandated that Ms. Lau to complete a second graduate program (despite being fully qualified for the job when she was hired, already with a graduate degree), while she was working a full-time job.

109.    In addition to Father Tom's bias against Ms. Lau based on her gender, Father Tom treated the male employees differently than the female employees in other ways.

110.    Examples include awarding a male employee (Mr. Rucker) perks not afforded to female employees.  Such perks included use of a truck to drive to and from work that was purchased by the parish; gas paid for by the parish; a cell phone purchased by the parish; access to technology that the female employees were not given (which prevented female administrators from effectively doing their jobs); freedom to work a second job; freedom to leave work early to

20

play golf; freedom to take multiple vacations during the school year; and paying the male employee a higher salary than females of a comparable level.

111.    Mr. Rucker has refused to provide female employees (including the Director of Technology and the Computer Science teacher) administrative rights to the school's cameras and technology, and his actions are fully supported by Father Tom, and are impediments to the effected female employees from being able to fully perform their jobs.  Mr. Rucker also prevented Ms. Lau from accessing the security cameras as of September 2017 despite her multiple requests that this be fixed.

112.    Father Tom granted the only male club moderator $5000 for his after school program.  No other after school club (with female moderators) received a stipend.

113.    Father Tom uses profanity to describe women to the male employee (including, but not limited to referring to female employees as "bitches"), and has exhibited verbally abusive and vocal about his disdain for women, regularly displaying bullying and intimidating behavior towards female employees, and berating female employees by email, and in person during meetings.  During a PTO meeting in August 2017, Father Tom lost his temper, called the PTO Vice President a "bitch" and used profanity when describing Ms. Conroy, the PTO Board and PTO members to Mr. Rucker.

114.    In or around the Fall, 2017, Ms. Lau reported Father Tom's harassment and discrimination to Ms. Conroy, her direct supervisor; in November 2017, Ms. Conroy reported Father Tom's harassment and discrimination to Superintendent Bigelow; in December 2017, Ms. Conroy reported Father Tom's harassment and discrimination to Assistant Superintendent Sister Karl Ann Homberg; and Ms. Lau made two reports about Father Tom's abusive, harassing and discriminatory conduct to EthicsPoint – in December 2017 and February 2018.

115.     Despite the multiple reports, and the many witnesses to Father Tom's hostile and discriminatory conduct, no action was taken.

116.     In addition, Father Tom posted the news of Ms. Lau's termination on the home page of the parish website, where it remained for approximately seven months.  However, when the male youth minister departed, his job opening was not posed on the church website.

117.     The Arlington Diocese's discriminatory treatment of Ms. Lau violated Title VII of the Federal Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2(a)(1).

118.     In discriminating against Ms. Lau in violation of federal law, the Arlington Diocese evidenced malice, spite, and ill will; its actions were willful and wanton; and evinced a conscious disregard for the rights of Ms. Lau.

119.     As a direct and proximate result of the Arlington Diocese's actions, Ms. Lau has suffered and continues to suffer anxiety, diminished self-confidence and self-worth, feelings of helplessness and hopelessness, insomnia, withdrawal from friends and family, fear and concern for her future ability to earn a living, crying, sadness, lack of concentration, grinding her teeth (for which she was treated by a dentist); humiliation, embarrassment, headaches, past and future loss of income and benefits of employment, lost career and business opportunities and advancement, medical expenses, other past pecuniary losses, future pecuniary losses, and other nonpecuniary losses.

120.     Due to the conscious disregard for Ms. Lau's federally protected rights, and the severity of the Arlington Diocese's conduct, Ms. Lau is also entitled to punitive damages.

**COUNT THREE -**
**RETALIATION, RETALIATORY DISCHARGE AND**
**HOSTILE WORK ENVIRONMENT IN VIOLATION OF TITLE VII**
**(Cindi Conroy against Catholic Diocese of Arlington)**

121.    The allegations of the foregoing paragraphs are incorporated as if realleged herein.

122.    The Arlington Diocese created a hostile and retaliatory environment during the course of Ms. Conroy's employment, in retaliation for Ms. Conroy's reporting and escalating of the complaints of discrimination and hostile work environment made to her, by Ms. Lau, which constituted protected activities.  In addition, as Ms. Lau's direct supervisor, Ms. Conroy had a responsibility and obligation to report the complaints of discrimination and hostile work environment made to her by Ms. Lau.

123.    After Ms. Lau reported Father Tom's harassment and discrimination to Ms. Conroy in the fall of 2017, in November 2017, Ms. Conroy reported Father Tom's harassment and discrimination to Superintendent Bigelow, escalating Ms. Lau's complaints; and in December 2017, Ms. Conroy reported and escalated he same complaints to Assistant Superintendent Sister Karl Ann Homberg.

124.    The Arlington Diocese had actual or constructive knowledge of this environment, yet refused to take effective measures to stop this course of conduct and instead, engaged in, and ratified, a course of retaliation against Ms. Conroy for reporting and escalating Ms. Lau's complaints about Father Tom's illegal, hostile and discriminatory conduct towards female employees.

125.    Such retaliation included creating and maintaining a hostile and harassing work environment, grossly demeaning and humiliating conduct, issuing Ms. Conroy an ultimatum that she could only return as Principal for the 2018-2019 school year if she fired Ms. Lau and Ms.

23

Beltran; the Arlington Diocese ignoring and not responding to Ms. Conroy's request for guidance on Father Tom's ultimatum; Father Tom storming into Ms. Conroy's office screaming at her and falsely accusing her of insubordination (for reporting his illegal conduct); yelling at Ms. Conroy that she was fired, despite the fact that she had been offered a verbal contract renewal just two days prior; calling Ms. Conroy's Assistant Principals (Ms. Lau and Ms. Beltran) over the loudspeaker to summon them and fire them; and failing to conduct a thorough and unbiased investigation into the multiple complaints about Father Tom's illegal, abusive and discriminatory conduct.

126.    This retaliatory and abusive conduct was ratified and condoned by the Arlington Catholic Diocese's lack of action to protect the administration, staff and students at SJS, and by its sham investigation that found no wrongdoing by Father Tom doing despite overwhelming evidence to the contrary and letters and petitions from parents.

127.    Ms. Conroy was fired in retaliation for her association with Ms. Lau, in that Ms. Conroy escalated and reported the complaints of Father Tom's abusive, discriminatory and harassing behavior made to her by Ms. Lau to Superintendent Bigelow and Assistant Superintendant Sister Karl Ann, and for following the procedures employees were encouraged to follow for reporting such a complaint made to her by her subordinates.

128.    In addition, Father Tom posted the news of Ms. Conroy's termination on the home page of the parish website, where it remained for approximately seven months, in further retaliation.

129.    The lack of substantive communication from Father Tom to the community was intended to create the false impression that Ms. Conroy had done something wrong to warrant

her termination. There were rumors, misinformation, and gossip spread about the reason for her termination, including that she was engaged in a sexual relationship with Ms. Lau.

130.    Ms. Conroy was an excellent performer.  Under her administration, SJS, as well as its teachers and community, was thriving, and the students had the best test scores in the Diocese.  As per Diocesan policy, an employee must be informed in writing by April 15, if the employee will not be offered a contract for the following school year.  Ms. Conroy was never notified in writing that she would not be offered a contract for the 2018-2019 school year, in further retaliation for her engaging in the protected activity of reporting Father Tom's illegal, hostile and discriminatory conduct, all of which was corroborated by other administrators, parents and teachers of SJS.

131.    No adverse action was taken against Father Tom for his illegal, retaliatory and hostile behavior towards Ms. Conroy, as detailed above.

132.    The Arlington Diocese's retaliatory treatment of Ms. Conroy violated Title VII of the Federal Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2(a)(1).

133.    In retaliating against Ms. Conroy in violation of federal law, the Arlington Diocese evidenced malice, spite, and ill will; its actions were willful and wanton; and evinced a conscious disregard for the rights of Ms. Conroy.

134.     As a direct and proximate result of the Arlington Diocese's actions, Ms. Conroy has suffered and continues to suffer anxiety, diminished self-confidence and self-worth, feelings of helplessness and hopelessness, insomnia, withdrawal from friends and family, fear and concern for her future ability to earn a living, crying, sadness, lack of concentration, humiliation, embarrassment, headaches, past and future loss of income and benefits of employment, lost career and business opportunities and advancement, medical and health expenses, other past

pecuniary losses, future pecuniary losses, and other nonpecuniary losses.  Ms. Conroy sought counseling due to the impact of the stress on her physical and emotional health, and the manner in which the administrative team was fired.

135.    Due to the conscious disregard for Ms. Conroy's federally protected rights, and the severity of the Arlington Diocese's conduct, Ms. Conroy is also entitled to punitive damages.

**COUNT FOUR -**
**RETALIATION, RETALIATORY DISCHARGE AND**
<u>**HOSTILE WORK ENVIRONMENT IN VIOLATION OF TITLE VII**</u>
**(Eileen C. Lau against Catholic Diocese of Arlington)**

136.    The allegations of the foregoing paragraphs are incorporated as if realleged herein.

137.    The Arlington Diocese created a hostile and retaliatory environment during the course of Ms. Lau's employment, in response to complaints of discrimination and hostile work environment made by Ms. Lau, which constituted protected activities.  The Arlington Diocese learned of Ms. Lau's complaints, made to her supervisor, Ms. Conroy, through Ms. Conroy's escalation of Ms. Lau's complaints through the proper reporting chain, and by Ms. Lau's own, independent reporting of her complaints of discriminatory and hostile conduct, on two separate occasions, to EthicsPoint.

138.    The Arlington Diocese had actual or constructive knowledge of this environment, yet refused to take effective measures to stop this course of conduct and instead, engaged in, and ratified, a course of retaliation against Ms. Lau for reporting Father Tom's illegal, hostile and discriminatory conduct towards female employees, including Ms. Lau.

139.    Such retaliation included creating and maintaining a hostile and harassing work environment, grossly demeaning and humiliating conduct, summoning Ms. Lau over the loud speaker after Ms. Conroy was fired in order to fire her also; telling Ms. Lau she could finish out

the school year, but would not be offered a contract for the 2018-19 school year; requiring Ms. Lau to remain in the school building until 9 pm the day she was fired because of the annual school Science Fair and forcing her to remain silent about the traumatic experience that had occurred earlier in the day; failing to conduct a thorough and unbiased investigation into the multiple complaints about Father Tom's illegal conduct; and firing Ms. Lau so that she would no longer be able to meet the terms of her scholarship award (needed to complete the program for the *second* graduate degree Father Tom inexplicable required her to pursue), requiring her to have to repay the scholarship money, causing financial hardship on Ms. Lau.

140.    This retaliatory and abusive conduct was ratified and condoned by the Arlington Diocese's lack of action to protect the administration, staff and students at SJS, and its sham investigation that found no wrong doing despite overwhelming evidence to the contrary and letters and petitions from parents.

141.    Ms. Lau was fired in retaliation for her complaints reports of Father Tom's abusive, discriminatory and harassing behavior, escalated by Ms. Conroy to Superintendent Bigelow, Assistant Superintendant Sister Karl Ann, and for her own reporting to EthicsPoint on two occasions, and for following the policies and procedures employees were encouraged to follow for reporting harassment.

142.    In addition, Father Tom posted the news of Ms. Lau's termination on the home page of the parish website, where it remained for approximately seven months, in further retaliation.

143.    The lack of substantive communication from Father Tom to the community was intended to create the false impression that Ms. Lau had done something wrong to warrant her termination. There were rumors, misinformation, and gossip spread about the reason for her

termination, including that she was a lesbian and engaged in a sexual relationship with Ms.

Conroy, and that she had embezzled funds/  Father Tom also falsely announced to the SJS

faculty and to parishioners that Ms. Lau is not Catholic nor a leader

144.    Ms. Lau was an excellent performer.  While she was part of the administrative

team, SJS, as well as its teachers and community, was thriving, and the students had the best test

scores in the Diocese.  As per Diocesan policy, an employee must be informed in writing by

April 15, if the employee will not be offered a contract for the following school year.  Ms. Lau

was never notified in writing that she would not be offered a contract for the 2018-2019 school

year, in further retaliation for her engaging in the protected activity of reporting Father Tom's

illegal, hostile and discriminatory conduct, all of which was corroborated by other

administrators, parents and teachers of SJS.

145.    No adverse action was taken against Father Tom for his illegal, retaliatory and

hostile behavior towards Ms. Lau, as detailed above.

146.    The Arlington Diocese's retaliatory treatment of Ms. Lau violated Title VII of the

Federal Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2(a)(1).

147.    In retaliating against Ms. Lau in violation of federal law, the Arlington Diocese

evidenced malice, spite, and ill will; its actions were willful and wanton; and evinced a conscious

disregard for the rights of Ms. Lau.

148.    As a direct and proximate result of the Arlington Diocese's actions, Ms. Lau has

suffered and continues to suffer anxiety, diminished self-confidence and self-worth, feelings of

helplessness and hopelessness, insomnia, withdrawal from friends and family, fear and concern

for her future ability to earn a living, crying, sadness, lack of concentration, grinding her teeth

(for which she was treated by a dentist); humiliation, embarrassment, headaches, past and future

loss of income and benefits of employment, lost career and business opportunities and advancement, medical expenses, other past pecuniary losses, future pecuniary losses, and other nonpecuniary losses.

149.    Due to the conscious disregard for Ms. Lau's federally protected rights, and the severity of the Arlington Diocese's conduct, Ms. Lau is also entitled to punitive damages.

**COUNT FIVE -**
**NEGLIGENT RETENTION OF EMPLOYEE (FATHER TOM BOURQUE)**
**(Cindi Conroy and Eileen C. Lau against Catholic Diocese of Arlington)**

150.    The allegations of the foregoing paragraphs are incorporated in this count as if re-alleged here in full.

151.    Arlington Diocese had a duty to its employees, including Ms. Conroy and Ms. Lau, not to retain or appoint employees whom it knew or should have known were likely to harm its employees and/or to violate laws designed to protect the public.

152.    Arlington Diocese had actual and constructive knowledge that Father Tom engaged in discriminatory, retaliatory, hostile, harassing, inappropriate, unprofessional and illegal behavior towards Ms. Conroy and Ms. Lau and others in the workplace, and towards parent PTO volunteers of SJS.

153.    Despite this knowledge, the Arlington Diocese retained Father Tom in a position of superiority and supervisory authority over Ms. Conroy and Ms. Lau, which he used to threaten their job security and her livelihood, and which he used to issue an ultimatum to Ms. Conroy to fire Ms. Lau and another top performing female administrator, Ms. Beltran, if she wanted to keep her job.

154.    The Arlington Diocese retained Father Tom in a position in which he could harass, discriminate against, retaliate against, and otherwise treat Ms. Conroy and Ms. Lau and

others in a hostile and threatening manner, including threatening Ms. Conroy's and Ms. Lau's

employment; referring to female employees as "bitches;" engaging in bullying and intimidating

behavior towards female employees; berating female employees by email and in person during

meetings; calling the PTO Vice President a "bitch;" using profanity when describing Ms.

Conroy, the PTO Board and PTO members to Mr. Rucker; losing his temper at a PTO meeting

and becoming belligerent and verbally attacking the PTO Board, and threatening that he and the

others priests would not attend the school's annual fund raiser because he did not agree with the

location choice; granting a stipend only to the male-supervised after school club; storming into

Ms. Conroy's office screaming at her, falsely accusing her of insubordination (for reporting his

conduct) and yelling that she was fired despite the fact that she had been offered a verbal

contract two days prior; summoning Ms. Lau and Ms. Beltran over the loud speaker to fire them

and then requiring that they remain at school for the science fair until 9 PM on the day they were

fired; threatening members of the parish staff that if they talked about him or talked to the

administrative team, they would be immediately fired; yelling at staff in an abusive manner and

causing an employee to break down in tears, begging Ms. Lau not to leave and to "help Cindi;"

disseminating false rumors about Ms. Conroy and Ms. Lau; posting the news of their firings on

the home page of the parish website; and abruptly terminating Christy Slifkey (whose husband is

the PTO President).

155.    In fact, Arlington Diocese, after becoming aware of the conduct of Father Tom,

through Ms. Conroy's reporting of Ms. Lau's complaints, Ms. Lau's own reporting to

EthicsPoint, and through numerous letters and a petition from SJS parents calling for the removal

of Father Tom pending a full investigation and findings, questioning his qualifications, crediting

Father Tom with creating and maintaining a "virulent environment," detailing Father Tom's

harassing and abusive conduct towards staff and the SJS community at large (including the SJS PTO and fundraisers), and demanding answers as to why he was allowed to continue his abusive behavior, continued to retain Father Tom as a supervisory employee over Ms. Conroy and Ms. Lau, by which he retained the authority to terminate their employment, and that of other top performers, which he did.

156.     Ms. Conroy and Ms. Lau's complaints about Father Tom's illegal, unprofessional, inappropriate, discriminatory, retaliatory and hostile conduct towards them were ignored.  Ms. Bigelow's response to Ms. Lau, when asked if she had endorsed the administrative team being fired without just cause, was "the pastor can do whatever he wants."

157.     Arlington Diocese was negligent in retaining Father Tom after it learned, or should have learned, that he was treating Ms. Conroy and Ms. Lau (and others, including Ms. Beltran) in an illegal, unprofessional, inappropriate, hostile, discriminatory and retaliatory manner, and using his position threaten Ms. Conroy and Ms. Lau's job security, and ultimately, terminate their employment.

158.     Arlington Diocese was on notice that Father Tom was treating Ms. Conroy and Ms. Lau and others, including SJS staff, PTO officers and PTO members, in an illegal, unprofessional, inappropriate, hostile, discriminatory, and retaliatory manner, and using his position to threaten the job security of Ms. Conroy, Ms. Lau and others, and threatening to pull his support from PTO fund raising activities, because Ms. Lau, through Ms. Conroy and independently, reported his behavior to school officials on multiple occasions, including to Superintendent Bigelow and to Assistant Superintendent Sister Karl Ann Homberg, and because Ms. Conroy reported the ultimatum issued to her by Father Tom to fire Ms. Lau and Ms. Beltran to Ms. D'Elia and Dana Brooks of Human Resources.

159. Had Arlington Diocese promptly and properly removed Father Tom from the workplace, he would not have had the opportunity to continue to engage in this conduct, or to harm Ms. Conroy and Ms. Lau and others. Instead, Arlington Diocese took no action and allowed Father Tom to continue his course of illegal, discriminatory, abusive, hostile and retaliatory behavior, unfettered.

160. This conduct by Arlington Diocese was actuated by malice, spite, and ill will; was willful and wanton; and evinced conscious disregard for the rights of Ms. Conroy and Ms. Lau.

161. Ms. Conroy and Ms. Lau suffered harm as a result of Arlington Diocese's negligent retention of Father Tom, including loss of advancement and career opportunities and the attendant employment benefits.

162. Arlington Diocese's retention of Father Tom, in the face of knowledge of his illegal conduct, constituted gross negligence and evinced a conscious disregard for the rights of Ms. Conroy and Ms. Lau.

163. Arlington Diocese's retention of Father Tom as an employee, and its failure to protect Ms. Conroy and Ms. Lau from Father Tom, was willful and wanton in that it exhibited a conscious disregard for the rights of Ms. Conroy and Ms. Lau. The Arlington Diocese was aware of the propensity of Father Tom to engage in illegal conduct that would harm Ms. Conroy and Ms. Lau and the public, including based on his inappropriate and unprofessional behavior towards others in staff meetings and PTO meetings, and because of Ms. Conroy and Ms. Lau's multiple complaints about his conduct.

164. Arlington Diocese exhibited a reckless indifference in its failure to protect Ms. Conroy and Ms. Lau and the public and in retaining Father Tom. Arlington Diocese was aware from the existing circumstances that its failure to act to protect Ms. Conroy and Ms. Lau and the

public (by terminating Father Tom and discontinuing his illegal conduct) would likely result in harm to Ms. Conroy and Ms. Lau and the public.

165.    Arlington Diocese ratified and condoned the conduct of Father Tom by refusing to take any action to prevent him from taking further action against Ms. Conroy and Ms. Lau and others.  The Arlington Diocese refused to take action despite awareness that Father Tom's conduct was continuing and that he threatened Ms. Conroy and Ms. Lau's job, and knowing he had engaged in similar conduct with other employees.

166.    Arlington Diocese also ratified and condoned the conduct of Father Tom by leaving him in Ms. Conroy and Ms. Lau's chain of command and continuing to allow him to be in a position of authority over them, whereby he retained the power and authority to terminate their employment.

167.    Arlington Diocese is further responsible for the actions of Father Tom because, as he was acting in the scope of his employment, and with the express authority over Ms. Conroy and Ms. Lau that was granted to him as Arlington Diocese's agent.

168.    As a direct and proximate result of the Arlington Diocese's actions, Ms. Conroy and Ms. Lau have each suffered and continues to suffer anxiety, diminished self-confidence and self-worth, feelings of helplessness and hopelessness, insomnia, withdrawal from friends and family, fear and concern for her future ability to earn a living, crying, sadness, lack of concentration, humiliation, embarrassment, headaches, past and future loss of income and benefits of employment, lost career and business opportunities and advancement, medical expenses, other past pecuniary losses, future pecuniary losses, and other nonpecuniary losses.

169.    Ms. Conroy sought counseling due to the impact of the stress on her physical and emotional health, and the manner in which the administrative team was fired, and Ms. Lau was treated by a dentist after she started grinding her teeth due to stress.

170.    Due to the character and severity of Arlington Diocese's conduct, Ms. Conroy and Ms. Lau are each entitled to punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs CYNTHIA CONROY and EILEEN C. LAU, jointly and severally, requests that this Court enter judgment in their favor, against Defendant CATHOLIC DIOCESE OF ARLINGTON, on the above Counts; and further:

(a)    Award Ms. Conroy compensatory damages to be determined by a jury, plus demonstrated past and future pecuniary damages on each of the above-stated Counts One, Three and Five; and in addition

(b)    Award Ms. Lau compensatory damages to be determined by a jury, plus demonstrated past and future pecuniary damages on each of the above-stated Counts Two, Four and Five; and in addition

(c)    Award Ms. Conroy punitive and exemplary damages, to be determined by a jury, and in any event to be restricted by the statutory cap of $350,000.00 on Counts One, Three and Five; and in addition

(d)    Award Ms. Lau punitive and exemplary damages, to be determined by a jury, and in any event to be restricted by the statutory cap of $350,000.00 on Counts Two, Four and Five; and in addition

(e)     Award Ms. Conroy and Ms. Lau each appropriate front pay and back pay, including all lost income and benefits of employment both past and future; and in addition

(f)     Award Ms. Conroy and Ms. Lau their attorneys' fees and the costs of this action; and in addition

(g)     Award injunctive relief consisting of an order prohibiting Defendants the Catholic Diocese of Arlington from engaging in further employment practices that create or tolerate a hostile, discriminatory or retaliatory work environment based on gender; and in addition

(h)     Award Ms. Conroy and Ms. Lau each reinstatement with all back pay and benefits; and

(i)     Award Ms. Conroy and Ms. Lau each such other and further relief as may be appropriate under the circumstances.

## **JURY DEMAND**

PLAINTIFFS CYNTHIA CONROY AND EILEEN C. LAU DEMAND A TRIAL BY JURY.

November 14, 2018                          Respectfully submitted,

                                         */S/ CARLA D. BROWN*

                                         Carla D. Brown
                                         Virginia Bar No. 44803
                                         cbrown@cbcblaw.com
                                         CHARLSON BREDEHOFT
                                           COHEN & BROWN, P.C.
                                         11260 Roger Bacon Drive, Suite 201
                                         Reston, Virginia 20190
                                         (703) 318-6800  Telephone
                                         (703) 318-6808  Facsimile

                                         *Counsel for Plaintiffs,*
                                         *  Cynthia Conroy and Eileen C. Lau*